

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

RECEIVED

MAR 1 1 2022

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MINNESOTA<br><br>*ex rel.* CARRIE CREMIN AND SUSANNE POLZIN,<br><br>Relators,<br><br>v.<br><br>TAREEN DERMATOLOGY, P.A., DR. MOHIBA TAREEN, AND DR. BASIR TAREEN,<br><br>Defendants. | **CASE NO. 19-sc-2457 (JRT/KMM)**<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMAND**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Relators Carrie Cremin and Susanne Polzin, by and through their attorneys, bring

this First Amended Complaint on behalf themselves and the United States under 31 U.S.C.

§ 3730. Based on personal knowledge, unless otherwise indicated, and relevant documents,

Relators allege the following:

## I.   INTRODUCTION

1.   This is an action for damages and civil penalties under the federal False

Claims Act, 31 U.S.C. §§ 3729 *et seq.* and Minnesota False Claims Act, Minn. Stat. §

15C.02(a)(1)*.* It alleges that Defendant Tareen Dermatology, P.A. (Tareen Dermatology),

Defendant Dr. Mohiba Tareen, and Defendant Dr. Basir Tareen (collectively Defendants),

knowingly submitted false and/or fraudulent claims to Medicaid, Medicare, TRICARE,

and other government payors by (1) up-coding services rendered in order to increase the



Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

reimbursement amount received from government payors, (2) providing medically unnecessary services, (3) providing kickbacks to patients through routine co-pay waivers and to employees through bonuses and other inducements in violation of the Anti-Kickback Statute (AKS), and (4) billing for services rendered by Defendants' physician assistants under the National Provider Identifier (NPI) number of Dr. Mohiba Tareen. Further, it alleges that Defendants retaliated against Relator Polzin and wrongfully terminated her employment in violation of the federal and Minnesota False Claims Acts (FCA and MFCA), the Minnesota Whistleblower Act (MWA), and Minnesota's prohibition of wrongful discharge in violation of public policy.

2.       Defendants engaged in at least three unique up-coding schemes with various procedures offered at Tareen Dermatology. First, Defendants billed for excimer services, when phototherapy was actually provided, and in conjunction, provided these services to patients with unapproved health conditions, including alopecia and vitiligo. Second, Defendants billed for excision services when only electrodessication and curettage services were actually provided. Third, Defendants billed for Mohs procedures as though Tareen Dermatology provided pathology services, when those services were actually outsourced to a third party. Each of these up-coded services billed at a higher reimbursement amount than that of the services actually rendered, resulting in false and/or fraudulent billings.

3.       Defendants also engaged in a systemic practice of performing unnecessary biopsy removals on patients and scheduling unnecessary follow-up visits with patients. Dr. Mohiba Tareen routinely maxed out the number of biopsies she could perform in a single

2

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

visit regardless of the medical necessity of such procedures. Additionally, she required patients to come for multiple appointments when the same services could have been provided in fewer visits. She did this to maximize the number of office visits she could bill for.

4.     In addition, Defendants violated the AKS by providing routine co-pay waivers to patients without any assessment as to the individual patient's financial need. Defendants did this to induce those patients to continue using Defendants' services. Almost every patient seen at Tareen Dermatology for laser and phototherapy treatment was required to complete a financial hardship form, to enable Defendants to waive co-pays for patients, many of whom had multiple visits each week to Tareen Dermatology.

5.     Defendants further violated the AKS by providing bonuses and other inducements to their employees for referring patients to Defendants' on-site non-pharmacy dispensary to have prescriptions filled.

6.     Additionally, Defendants submitted false and fraudulent claims, and violated "incident to" billing requirements, when they submitted claims for payment under the NPI of Dr. Mohiba Tareen, when in fact services were actually rendered by physician assistants employed at Tareen Dermatology, P.A.

## II.     JURISDICTION AND VENUE

7.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a), because Defendants can be found and do business in this District. In addition, Defendants have committed acts proscribed by 31 U.S.C. §§ 3729 *et seq*. in this District.

9.      Relators are aware of no statutorily relevant public disclosure of the allegations or transactions in this First Amended Complaint. Even if such a disclosure had occurred, Relators are "original sources" of the allegations in this First Amended Complaint and meet the requirements of 31 U.S.C. § 3730(e)(4)(B). Relators acquired direct and independent knowledge of the information on which the allegations in this First Amended Complaint are based, and Relators voluntarily and in good faith provided this information to the government before filing this action.

### III.   PARTIES

#### A. Plaintiffs/Relators

10.     The United States of America is a governmental plaintiff on whose behalf the Relators bring this action under 31 U.S.C. § 3729 *et seq*. The United States acts through its various agencies and departments, including the Department of Health and Human Services (HHS), and the Medicaid, Medicare, and TRICARE programs.

11.     The State of Minnesota is also a governmental plaintiff on whose behalf Relators bring this action under Minn. Stat. § 15C.02(a)(1).

12.     Relator Cremin is a citizen of the United States and a resident of Pierce County, Wisconsin. Relator Cremin began working at Tareen Dermatology in June 2014

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

as a Clinical Assistant and soon after that became the Director of Laser Therapy. She is a certified medical assistant and excimer laser technician.

13.     Relator Polzin is a citizen of the United Sates and a resident of Ramsey County, Minnesota. Relator Polzin began working at Tareen Dermatology in June 2021 as a Billing Specialist. On December, 13, 2021, Tareen Dermatology terminated her employment in retaliation for her good faith reports of, and other efforts to stop, what she reasonably believed to be illegal conduct.

### B. Defendants

14.     Tareen Dermatology, P.A. is a company organized in December 2011 and authorized to conduct business in the State of Minnesota. Tareen Dermatology's principal office is located in Roseville, Minnesota. It has additional offices in Faribault and Maplewood, Minnesota. Tareen Dermatology provides dermatology medical care, including surgical and cosmetic, among others, to persons in Minnesota. Tareen Dermatology accepts Medicaid, Medicare, and TRICARE insurances, among others.

15.     Defendant Dr. Mohiba Tareen is an individual residing in Minnesota. She has at least some ownership interest in Tareen Dermatology, P.A. She is a board-certified dermatologist and graduate of the University of Michigan Medical School. Many of the billings at issue were submitted under her NPI—1740448117.

16.     Defendant Dr. Basir Tareen is an individual residing in Minnesota. He is the Chief Executive Officer of Tareen Dermatology, P.A. He is also a urologist with Metro Urology in Woodbury, Minnesota.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## IV.   STATUTORY AND REGULATORY CONTEXT

17.   Defendants violated the FCA and the MFCA by up-coding procedures, providing unnecessary services, waiving co-pays as a form of kickbacks, providing inducements to staff for pharmacy referrals as a form of kickbacks, and billing under Dr. Mohiba Tareen's NPI for services rendered by physician assistants, all of which caused false statements to be used and false claims to be submitted to government payors, including Medicare, Medicaid, and TRICARE.

### A. The False Claims Act

18.   The FCA provides:

(a) Liability for Certain Acts.

(1) . . . any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . is liable to the United States Government. . . .

(b) Definitions. For purposes of this section—

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information, and

(C)   require no proof of specific intent to defraud;

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

(2) the term "claim"—

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

        (i) is presented to an officer employee, or agent of the United States; or

        (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest and if the United States Government

            (I) provides or has provided any portion of the money or property requested or demanded; or

            (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded;

    (2) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.[1]

31 U.S.C. § 3729(a)(1)(A), (b) (FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21).

## B. Reimbursement by Government-Funded Health Care Programs

19.    Medicare, which provides health insurance for aged and disabled individuals, is administered by the Secretary of Health and Human Services (HHS) through the Centers for Medicare and Medicaid Studies (CMS). Medicare Part A authorizes payments from federal funds for hospitalization and post-hospitalization care. Medicare Part B similarly

---

[1] It "has never been the test of materiality that the misrepresentation or concealment would *more likely than not* have produced an erroneous decision," rather "the central object of the inquiry [is] whether the misrepresentation or concealment was predictably capable of affecting, *i.e.*, had a natural tendency to affect, the official decision." *Kungys v. U.S.*, 485 U.S. 759, 771 (1988) (emphasis in original; underlining added). *See also, Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 2002-03 ("Under any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation."); *U.S. v. Lindsey*, 850 F.3d 1009, 1017 (9th Cir. 2017) ("materiality is an objective element").

pays for medical and other health services, including physician services, certain pharmaceutical products, diagnostic tests, and other medical services not covered by Part A.

20.     Medicaid, jointly funded and administered by the federal and state governments, involves payments by the states directly to enrolled providers, with reimbursement from the United States Treasury, to provide medical assistance to individuals including persons who are low-income, blind, or disabled.

21.     Under 42 U.S.C. § 1395y Medicare excludes payment for services that are deemed medically unnecessary, including "items and services…[that] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." (*See also*, 42 C.F.R. §411.15(k)(l); Medicare Carrier's Manual § 2049).

22.     Accordingly, providers may only submit claims for Medicare reimbursement for "reasonable and necessary" medical services. In submitting claims, providers make certain express certifications, including an assurance that the services were "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1); *see also* 42 U.S.C. § 1395n(a)(2)(B) (to receive payment for claims providers must certify that services were "medically required").

23.     Medicare claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed.[2]

24.     A provider becomes eligible to provide services and receive payments under Medicare after completing the enrollment process and agreeing to comply with the provisions laid out in 42 U.S.C. § 1395cc, which include making adequate provisions for return of moneys received improperly.

### C. Enrolled Providers Must Certify Their Compliance with Applicable Laws and Regulations

25.     To receive payment for covered Medicare services, a provider or supplier must be enrolled in the Medicare program. 42 C.F.R. § 424.505.

26.     All Medicaid providers are required to enter into a provider agreement with the State as a condition of participation in the program. 42 C.F.R. §431.107(b).

27.     Once enrolled, physicians and health care providers must certify compliance with applicable laws, through means such as provider agreements, signed by physicians and other providers, including hospitals and ambulatory surgical centers, certifying that they will comply with applicable laws (*e.g.*, Forms CMS 855A, 855B, 855I, 1500). The certification includes an acknowledgement that compliance is a condition for receipt of payments from the government.

---

[2] *See United States v. R&F Props. Of Lake Cnty., Inc.*, 433 F.3d 1349, 1356 (11th Cir. 1996); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975).

28.     Additionally, each time a provider submits a claim, the provider certifies that the services were provided in accordance with federal and state statutes, regulations, and program rules.

29.     Both Medicare and TRICARE, through CMS Form 1500, require physicians and healthcare providers to certify the claim complies with the "Federal anti-kickback statute" and certify "the services on this form were medically necessary."

30.     CMS Form 1500 further provides notice that "[a]ny person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be…subject to civil penalties."

31.     Similarly, all Medicaid claim forms include the following certifications: (1) "This is to certify that the foregoing information is true, accurate, and complete," and (2) "I understand that payment of this claim will be from Federal and State funds, and that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R. § 455.18.

32.     Accordingly, through means such as provider agreements and claim forms, health care facilities and physicians who participate in federal or state health care programs generally must certify that they have complied with the applicable state and federal rules and regulations in order to receive payment for their services.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

### D. Federal Anti-Kickback Statute

33.     Enacted in 1987, the main purpose of the AKS "is to protect patients and federal health care programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions." OIG Fact Sheet, November 1999.

34.     The AKS applies to all federal healthcare programs, except FEHBP.[3] These include, among others, Medicare, Medicaid, TRICARE, Indian Health Services, and the Veterans Health Administration. All of these government-pay health care programs require every provider or supplier to ensure compliance with federal laws governing their services, including the AKS.

35.     When a company pays kickbacks to induce the use and purchase of the company's services, the integrity of the provider/patient relationship is fundamentally compromised. Government-funded healthcare programs, such as Medicare, Medicaid, and TRICARE, rely upon health care providers to decide what treatment and/or medical equipment is appropriate and medically necessary for patients, and, therefore, may be properly payable by that healthcare program. As a condition of reimbursement, government health care programs require that individuals and companies render their services without the influence or use of kickbacks.

36.     Many states, including Minnesota, have enacted similar prohibitions against illegal inducements to healthcare decision-makers and patients. *See, e.g.*, Minn. Stat § 62.23.

---

[3] Federal Employees Health Benefit Plan.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

37.     The AKS and analogous state laws make it a crime to knowingly and willfully offer, pay, solicit, or receive any remuneration to induce a person:

> (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or
>
> (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal healthcare program.

42 U.S.C. § 1320a-7b(b)(1) and (2).

38.     The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, in cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

39.     42 U.S.C. § 1320a–7a(i)(6)(A) explicitly states that "[t]he term remuneration' includes the waiver of coinsurance and deductible amounts ... and transfers of items or services for free or for other than fair market value." It requires that providers "not routinely waive coinsurance," that they not do it "as part of any advertisement or solicitation," and that they "determin[e] in good faith that the individual is in financial need." *Id.*

40.     Violations of the AKS must be knowing and willful. However, a person need not have actual knowledge or specific intent to commit a violation of this section. 42 U.S.C. § 1320a-7b(b)(1), (h).

41.     Compliance with the AKS is a condition of payment under the Medicare, Medicaid, and TRICARE programs. However, proof of an explicit *quid pro quo* is not required to show a violation of the AKS.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

42.     HHS has published "safe harbor" regulations that allow compensation of durable equipment or health care providers for activities that meet particular requirements. 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952. However, only those arrangements that precisely meet all of the conditions set forth in the safe harbor are afforded protection. The safe harbor regulations do not protect the practices here.

43.     The FCA imposes liability where a defendant knowingly causes such kickback-tainted claims to be billed to the Medicare, Medicaid, TRICARE, or other government funded healthcare programs.

44.     To protect against the erosion of patient care and patient safety, courts have uniformly agreed that compliance with the AKS is material to payment. *See United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004); *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211, 1223 n.8 (10th Cir. 2008); *United States ex rel. McNutt v. Honeyville Medical Supplies*, 423 F.3d 1256, 1259-1260 (11th Cir. 2005); and *United States v. Rogan, 459 F Supp.* 2d 692, 717 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008).

45.     On March 23, 2010, as part of the Patient Protection and Affordable Care Act, the AKS was amended to clarify that all claims resulting from a violation of the AKS are a violation of the FCA. That provision states: "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA.]" Public Law No. 111-148, 42 U.S.C. § 1320a-7(b)(g). Accordingly, the FCA makes compliance with the AKS a material condition of payment under the FCA.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Submission of a claim for healthcare services to a government payor therefore constitutes a certification that the claim is not tainted by any kickback.

46.     Submission of kickback-tainted claims are also actionable under the FCA because providers must certify their compliance with the AKS in provider agreements with the CMS (Form CMS-855I; Form 1500) and must revalidate that certification every five years. 42 C.F.R. § 424.515.

### E. Medicare Co-Payment Waivers and Co-Insurance

47.     Co-payment, deductible, or other owed amounts that are the patient's responsibility under the rules of the Medicare, Medicaid, or TRICARE programs, or any other governmental payor, may not be waived, except upon a case-by-case determination of financial need.

48.     Medicare generally covers 80% of the "reasonable charges" billed by the provider for the Medicare-approved health services provided to a patient. 42 U.S.C.§ 1395(a)(1). Accordingly, the patient is normally required to contribute the remaining 20% as a co-payment. 42 U.S.C. § 1395cc(a)(2)(A)(ii).

49.     Providers are required to collect co-payments except in the case of financial hardship. Although "financial hardship" is not precisely defined, it is commonly understood to require some true inability or hardship to pay, including whether the individual is receiving government assistance and based on some documentation or other substantiation.

14

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

50.     Routine waiver of co-payment, co-insurance, deductible, or other owed amounts violates the AKS. 42 U.S.C. § 1320a-7b(b). Further, routine waiver may cause: (1) false claims based on routine waiver without adjustment of a provider's actual charge; and (2) over-utilization.

51.     Additionally, 42 U.S.C. § 1320a-7b(b)(2)(B) prohibits a person from offering or transferring remuneration to a beneficiary whom such person knows or should know that the remuneration is likely to influence the beneficiary to order items or services from a particular provider or supplier for which payment may be made under a federal healthcare program. As stated above, "remuneration" is defined as including a waiver of coinsurance and deductible amounts. 42 U.S.C. § 1320a–7a(i)(6)(A).

### F. Healthcare Providers Must Use the Appropriate NPI When Submitting Claims

52.     Physicians, non-physician practitioners, and other providers must enroll in the Medicare program in order to be paid for covered services they provide to government-pay beneficiaries.

53.     To enroll in the Medicare program, providers must obtain a National Provider Identifier (NPI) number.[4]

---

[4] "The National Provider Identifier (NPI) is a Health Insurance Portability and Accountability Act (HIPAA) Administrative Simplification Standard. The NPI is a unique identification number for covered health care providers. Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under HIPAA. The NPI is a 10-position, intelligence-free numeric identifier (10-digit number)." *See* https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

54.     Minnesota Health Care Programs (MHCP) require providers eligible to obtain an NPI, to obtain one before enrolling with MHCP. Dr. Mohiba Tareen is enrolled with MHCP.[5]

55.     The enrollment and credentialing process is designed to protect government-pay beneficiaries from receiving care or services from unqualified practitioners.

56.     Until a provider is enrolled and credentialed, the provider cannot bill for services rendered to government-pay beneficiaries.

57.     As noted above, providers submit claims using CMS Form 1500, which requires the provider to include detailed patient information, insurance information, date of treatment, provider information, and other information relevant to the patient's treatment and claim.

58.     Critically, CMS Form 1500 requires the signature of the provider of the medical services. By signing CMS Form 1500, the "provider "certif[ies] that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were finished incident to my professional service by my employee under my immediate supervision, except as otherwise expressly permitted by Medicare or TRICARE" and "for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section."

---

[5]*See*
https://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERSION&RevisionSelectionMethod=LatestReleased&dDocName=ENROLL-HOME.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

59.     CMS Form 1500 further states, "For services to be considered 'incident to' a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills." *See also* 42 C.F.R. § 410.26.

60.     According to CMS guidelines, to "qualify as 'incident to,' services must be part of [a] patient's normal course of treatment during which a physician personally performed an initial service and remains actively involved in the course of treatment. [The physician] do[es] not have to be physically present in the patient's treatment room while these services are provided, but [the physician] must provide direct supervision, that is, [the physician] must be present in the office suit to render assistance, if necessary. The patient record should document the essential requirements for incident to service."[6]

61.     When a physician assistant bills for "incident to" services, the claim is paid at the higher, physician rate. However, when a physician assistant bills Medicare or another government payor directly under his or her own provider number, he or she is paid approximately 85-90% of the fee schedule amount that a physician would receive for the same services. Thus, improper "incident to" billing results in a provider receiving a 10-15% higher reimbursement than it is entitled to.

---

[6]https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/se0441.pdf

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## V.   FACTUAL ALLEGATIONS

### A. Relator Cremin's Direct Knowledge of Defendants' Illegal Conduct

62.   Relator Cremin began working at Tareen Dermatology in June 2014 as a clinical assistant. She split her time between clinical work and doing laser therapy for patients, including phototherapy.

63.   In April of 2015, Dr. Mohiba Tareen[7] directed Relator Cremin to have all patients seen at Tareen Dermatology for laser and phototherapy services sign a financial hardship agreement, so that patients could be seen without having to make co-payments or pay co-insurance. This routine waiver was executed with no good faith determination, on a case-by-case basis or otherwise, that financial need existed for the waiver. Relator Cremin understood Defendants implemented this policy to induce continued patient visits to Tareen Dermatology, as many were being treated 2-3 times per week.

64.   Around June 2015, Relator Cremin became a full-time laser technician. Later, she became the Director of Laser Therapy. In that role, Relator Cremin was responsible for laser treatment for various skin conditions, assisting in occasional skin cancer surveillance exams and procedures, and managing patient care within her department. In this role Relator Cremin treated patients diagnosed by Dr. Tareen, which is how she came to learn more about Defendants' fraudulent billing practices.

65.   Beginning in the summer of 2015, Dr. Tareen began directing Relator Cremin to change laser codes and patient diagnoses, as described in more detail below. If

---

[7] Unless otherwise specified, all references to Dr. Tareen refer to Dr. Mohiba Tareen.

18

billings were not being approved by government payors, Relator Cremin was instructed to change the eligibility information to a different diagnosis code. Relator Cremin understood that, prior to that time, A.B.,[8] a medical assistant at Tareen Dermatology, was the individual primarily responsible for that task.

66.     Relator Cremin is aware that patient treatment documentation was finalized and signed-off on by either Dr. Tareen or Dr. Basir Tareen (on behalf of Dr. Tareen) and then sent to Defendants' billing vendor, S.H., in Chicago, IL.

67.     On several occasions, patients came to Relator Cremin with their Explanation of Benefits (E.O.B.) forms raising concerns about high co-payments or co-insurance payments that had been applied to their accounts, and saying that they did not plan to continue treatment with Defendants for that reason. Relator Cremin would then have to assure them that those costs would be waived because they had signed financial hardship forms. In this way, Defendants' routine practice of having those patients sign financial hardship forms was directed at ensuring continued visits by patients. Relator Cremin is also aware that Defendants required S.H. to remove co-pay and co-insurance payments from patients' accounts if they had been posted.

68.     Additionally, Relator Cremin and other staff providing laser and phototherapy treatments received monetary bonuses of $1 to $2 for each laser/phototherapy

---

[8] Relators are in possession of the names for all individuals identified by initials throughout the First Amended Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

treatment provided to patients. To the extent these patients were government-pay beneficiaries, these bonuses violated the AKS.

69.     Relator Cremin observed the alleged fraudulent conduct throughout her employment. Relator Cremin left Tareen Dermatology in December 2017, but believes the conduct she observed continues today. Relator Polzin's knowledge and observations confirm this belief.

## B. Relator Polzin's Direct Knowledge of Defendants' Illegal Conduct

70.     When Defendants hired Relator Polzin as a Billing Specialist on June 1, 2021 she had over 30 years of medical billing experience. In this role, she was responsible for all clinical billings for both private insurance and government-pay beneficiaries. Her duties included charge and payment posting, remittances, claim filing, patient billing inquiries, and claim reconciliation. Accordingly, Relator Polzin worked directly on Medicare, Medicaid, and TRICARE billings and, through such work, observed Defendants' submission of false and/or fraudulent claims.

71.     When she was hired, Relator Polzin was aware that Defendants billings were still being sent to S.H. Relator Polzin understood that she and others were hired so that Defendants could bring billing services in-house.

72.     Soon after starting her employment with Defendants, while shadowing other departments, Relator Polzin learned from front desk employees that Defendants were providing routine hardship forms to all patients receiving stereotactic radiation therapy

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

(SRT)[9] and Laser/Phototherapy services—the same practice that had been occurring since Relator Cremin's employment with Defendants.

73.     While performing her duties as a Billing Specialist, Relator Polzin also learned that Defendants were billing Medicaid patients for no-show appointments, which she understood was not allowed under Medicaid requirements.

74.     On July 29, 2021, Defendants' Director of Finance, Cheryl Davis, sent an email to all staff, including Relator Polzin, stating that Defendants would "no longer be waiving Co-Pays or Co-Insurance for patients." The email, however, also said that Defendants would continue to honor this practice for patients currently undergoing treatment.

75.     Despite Defendants' illusion of stopping the routine waiver of co-payments and co-insurance, Relator Polzin learned in a conversation with Team Lead Billing Specialist, B.W., in October 2021, that the practice was still ongoing. Relator Polzin confronted Davis about this inconsistency, and expressed her concerns, but was simply told by Davis, "I will talk to B.W.," or words to that effect. Davis did not provide Relator Polzin any reason to believe Defendants ceased the practice.

76.     Relator Polzin is aware that all physician assistant's billings were processed and submitted using Dr. Tareen's NPI, even though Dr. Tareen did not provide services to all patients.

---

[9] SRT is a type of external radiation therapy that uses special equipment to precisely position the patient in order to deliver radiation to a well-defined cancerous tumor. With SRT, the total dose of radiation is divided into several smaller doses given over several days. SRT is typically used in an overall treatment plan to treat brain tumors and other brain disorders.

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

77.     Relator Polzin is also aware that the billing was not done in compliance with "incident to" requirements.

78.     Specifically, Relator Polzin observed during her employment that Defendants violated "incident to" requirements in at least three ways, 1) Dr. Tareen did not initiate treatment of patients seen by physician assistants, 2) Dr. Tareen was not on-site to provide direct supervision, and 3) the physician assistants who actually provided the services were not identified on CMS Form 1500.

79.     Relator Polzin was also concerned about pass-through billing as to Defendants' SRT services and about those billings occurring under Dr. Tareen's NPI number. Defendants purchased an SRT machine from another entity. However, rather than hire employees to operate the SRT and provide the services, Defendants utilized technicians from that same entity. Relator Polzin believed the billing was improper because employees of the other entity, not Defendants, performed the procedure.

80.     Relator Polzin observed this fraudulent conduct throughout her employment as a Billing Specialist for Defendants. Relator Polzin was terminated in December 2021 in retaliation for her good faith reports regarding, and efforts to stop, Defendants' fraudulent conduct.

### C. Defendants Up-coded Services Rendered in Order to Receive Higher Reimbursement

81.     Defendants engaged in at least three different types of up-coding schemes: (1) changing codes for phototherapy services to codes for excimer services; (2) changing codes for electrodessication & curettage services to codes for excision services; and (3)

changing codes for Mohs procedures–without pathology services to codes for Mohs procedures–with pathology services. Each of these schemes caused government payors to pay more than what the appropriate reimbursement code allowed.

82.     Additionally, Dr. Tareen represented that patients had certain covered medical conditions in patient charts, when in reality she was treating them for conditions that were not covered by government-pay insurances, including Medicaid, Medicare, and TRICARE.

### 1. Up-coding Phototherapy to Excimer & False Diagnosis

83.     Dr. Tareen "treated" conditions that were not covered by Medicare by mischaracterizing them.

84.     Phototherapy is defined as exposure to non-ionizing, ultraviolet radiation for therapeutic benefit by inducing DNA damage to the affected area. Treatments may be given 2-3 times per week for several weeks and may involve up to 40 treatments depending on the response of the condition to the therapy.

85.     Generally, phototherapy, Current Procedural Terminology (CPT)[10] code 96910, is deemed medically necessary for the treatment of dermatitis (i.e. atopic eczema).

---

[10] CPT is a medical code set that is used to report medical, surgical, and diagnostic procedures and services to entities such as physicians, health insurance companies, and accreditation organizations. The amount of money government healthcare programs pay a medical provider depends on which CPT codes the provider uses. The Medicare program requires physician providers to bill Medicare Part B services using CPT codes to describe the procedures and services provided. *See* 45 C.F.R. § 162.1002; Medicare Claims Processing Manual, Ch. 12, § 30. CPT codes determine both coverage (i.e., whether Medicare will pay for the billed medical procedures and services) and the reimbursement amount (i.e., how much Medicare will pay for the billed medical procedures and services). For all CPT codes, the medically necessary service and the procedure must be appropriately and sufficiently documented by the physician or qualified non-physician practitioner in the patient's medical record to support the claim for these services. *See* Medicare Claims Processing Manual, Ch. 12, § 30.6.6(B).

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Phototherapy is not a covered service for alopecia (hair loss) or vitiligo (skin pigment condition), as both of these treatments are considered cosmetic, rather than medically necessary.

86.    At least from 2014-2019, Defendants charged Medicare $150 and were reimbursed approximately $50 for each submission to government payors for services billed under code 96910.

87.    Excimer laser therapy is a form of ultraviolet laser used to increase the precision and delivery of ultraviolet-B energy to targeted tissue. Treatments are typically given 2-3 times per week on nonconsecutive days, and are given for 4-36 weeks depending on the response of the condition to the therapy.

88.    Generally, excimer laser therapy, CPT codes 96920-22, is deemed medically necessary for the treatment of psoriasis. Excimer laser therapy is not a covered service for alopecia or vitiligo as both are considered cosmetic treatments and not medically necessary. Further, dermatitis treatment with excimer laser therapy is not deemed medically necessary as the treatment is considered experimental.

89.    At least from 2014-2019, Defendants charged Medicare approximately $354 and were reimbursed approximately $120 for each submission to government payors for services billed under 96920 (the code most frequently used).

90.    Relators observed that Dr. Tareen regularly treated government-pay patients with alopecia or vitiligo, or other non-covered treatments, and then billed for those services under CPT codes 96910 and 96920-22.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

91.     For example, on January 5, 2016, Dr. Tareen directed Relator Cremin to chart as though Patient A[11] had dermatitis even though she was actually being treated for alopecia.

92.     Relator Cremin communicated the directive regarding Patient A to her colleague M.E., and stated, "FYI…We are doing laser on her, and charting it as laser for dermatitis (she has alopecia)."

93.     Additionally, Dr. Tareen falsely and/or fraudulently billed government-pay patients under CPT codes 96920-22 (excimer laser therapy) in order to receive the higher reimbursement rate excimer laser therapy provided when she was actually providing phototherapy services to those patients.

94.     The chart below compares the charges Dr. Tareen submitted to Medicare for phototherapy services (96910) and excimer laser therapy (96920) from 2014-2019.

| Year | Number of Medicare Services under CPT Code 96910: Phototherapy | Number of Medicare Services under CPT Code 96920: Excimer Laser Therapy |
|------|------|------|
| 2014 | 0 | 98 |
| 2015 | 0 | 226 |
| 2016 | 382 | 418 |
| 2017 | 780 | 905 |
| 2018 | 743 | 538 |
| 2019 | 1,642 | 1,418 |

---

[11] Relator Cremin is in possession of Patient A's real name.

95.     As Dr. Tareen's fraudulent scheme progressed, she moved from the bottom 40% of physicians billing under code 96920 in 2014, to the top 40% of those billers by 2015 and continued to increase the number of services rendered in 2016 by 192 from the previous year. By 2019, she had increased billings under code 96920 to more than 1,400.

96.     Dr. Tareen also treated government-pay patients with dermatitis—a covered treatment under phototherapy—with excimer laser treatment therapy and then changed the codes to reflect that phototherapy services were performed. Although this practice resulted in a lower reimbursement rate, Dr. Tareen was able to continue to see patients multiple times a week and get reimbursed for services that would otherwise not be covered by government payors and for which patients would have to pay out-of-pocket.

97.     For example, on January 7, 2016, Relator Cremin sent an email asking for a billing clarification, and Dr. Tareen responded, "please document as excimer, exactly as you do excimer, I will take care of changing it to the phototherapy codes."

98.     Defendants' practice of treating conditions not covered by government payors and changing the codes submitted for reimbursement from phototherapy to excimer laser therapy caused the government to pay for fraudulently submitted claims.

### 2. Up-coding Electrodessication & Curettage to Excision

99.     Relator Cremin also observed Dr. Tareen's second up-coding scheme, which was to provide electrodessication & curettage services, but then submit bills as though excision services had been provided.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

100.   Electrodessication & curettage services involve scraping a small lesion with a curette and then burning the site with an electrocautery needle.

101.   Electrodessication & curettage services are billed under CPT codes 11300-11313. When Dr. Tareen properly billed government payors under CPT codes 11301 and 11302 (the codes Defendants generally used), she was reimbursed at approximately $77 and $96 respectively.

102.   Excision services involve completely removing the skin lesion by cutting completely through the dermis. The skin around the surgical site is then closed with stiches.

103.   Excision services are billed under CPT codes 11400-11442. Dr. Tareen generally billed under codes 11400, 11401, and 11402, which are reimbursed at approximately $90, $113, and $131 respectively.

104.   Relator Cremin observed that Dr. Tareen regularly up-coded her billings to government payors from electrodessication & curettage to excision in order to receive the higher reimbursement rates.

105.   This conduct resulted in false and/or fraudulent billings being submitted to government payors.

### 3. Up-coding Mohs Procedures

106.   The third up-coding scheme Relator Cremin became aware of was improper billing for Mohs procedures.

107.   In Mohs surgery, dermatologists typically perform the dual role of cancer surgeon and pathologist. The Mohs procedure involves the surgical removal of the visible

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

portion of the skin cancer, which is then examined on site, while the patient waits, and the pathology results are then used to determine if additional removal is necessary. Mohs surgery involves removing thin layers of cancer-containing skin, examining those layers, and then repeating the removal of another thin layer, until only cancer-free tissue remains.

108.   The staging of procedures in this manner allows for more rapid completion of surgery and removal of the cancerous tissue with the least amount of excisions possible.

109.   Mohs surgery is billed under CPT codes 17311-17314. These codes are appropriately used when the procedure and pathology interpretation are both done in the same visit on-site by the surgeon.

110.   If pathology interpretation is not done by the surgeon, then CPT codes 11600-11646 are used. These codes have a significantly lower reimbursement then those codes used when pathology interpretation is done as well, as evidenced in the chart below.[12]

| CPT Code | Reimbursement Amount (without pathology) |
|----------|------------------------------------------|
| 11602 | $233 |
| 11603 | $222 |
| 11604 | $303 |
| CPT Code | Reimbursement Amount (with pathology) |
| 17311 | $651 |
| 17312 | $386 |
| 17313 | $615 |

---

[12] Reimbursement amounts are subject to change, and may differ by year.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

111.   Dr. Tareen regularly performs Mohs surgeries on government-pay patients, but she does not do the pathology interpretation. Rather, it is sent off-site to a third party. Generally, patients are sent home while they await the pathology results. Instead of billing under the proper code, Dr. Tareen bills under 17311, 17312, and 17313.

112.   From 2014-2019, Dr. Tareen fraudulently billed Medicare for numerous Mohs procedures:

| Year | Number of Medicare Services under CPT Codes 11600-11646 | Number of Medicare Services under CPT Codes 17311-17314 |
|------|--------------------------------------------------------|--------------------------------------------------------|
| 2014 | 0 | 56 |
| 2015 | 33 | 102 |
| 2016 | 66 | 147 |
| 2017 | 67 | 136 |
| 2018 | 77 | 149 |
| 2019 | 94 | 220 |

113.   Each procedure billed under CPT code 17311-17314 constitutes a false claim because Dr. Tareen does not perform the pathology interpretations. Accordingly, Defendants' conduct resulted in hundreds of fraudulent billings to Medicare alone.

114.   Defendants' fraudulent upcoding resulted in hundreds of false claims paid by government payors in violation of the FCA.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## C. Defendants' Excessive and Medically Unnecessary Biopsies

115.   A biopsy involves (1) a doctor shaving a growth off the skin, (2) processing the tissue to prepare it for pathology analysis, and (3) sending the tissue out to a lab for pathology analysis to determine if it is cancerous.

116.   Dermatologists generally should be able to determine visually whether something is potentially cancerous.

117.   Dr. Tareen biopsied spots or lesions that she knew to be benign in order to be reimbursed for those services at higher rates from government payors.

118.   Further, during those visits, Dr. Tareen routinely maxed out the number of biopsies performed on a given patient during their visits regardless of medical necessity. Dr. Tareen had documents around the office identifying the maximum number of removals allowed for each insurance company that would be billed.

119.   Biopsies are billed under CPT codes 11100 and 11101.

120.   Medicare reimburses approximately $70 for a biopsy, and approximately $26 for each additional biopsy. On average Dr. Tareen submitted charges to government payors of approximately $204.

121.   Relators observed that, as a standard practice, Dr. Tareen perfumed many more biopsies than other doctors and physician assistants at Tareen Dermatology, and Relators believe that many of those biopsies were not medically necessary.

   a.   2014 – other doctors: 25-49; Dr. Tareen: more than 380.

   b.   2015 – other doctors: 31-53; Dr. Tareen: more than 490.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

c.  2016 – other doctors: 13-15; Dr. Tareen: more than 700.

d.  2017 – other doctors: 59-85; Dr. Tareen: more than 2,000.

e.  2018 – other doctors: 52-79; Dr. Tareen: more than 1,900.

122.    There is a degree of judgment in choosing to perform a biopsy, and some physicians may be more cautious than others, but the significantly skewed number of biopsies performed indicates that Dr. Tareen is doing biopsies that are not medically necessary.

123.    Defendants billed for medically unnecessary biopsies, which resulted in false and/or fraudulent claims being submitted to government payors in violation of the FCA.

### D. Defendants Manipulated Office Visit Billings in Order to Receive Higher Reimbursement Amounts for Medically Unnecessary Visits

124.    When patients come in for a specific procedure, that visit is typically billed for the procedure, but not an office visit. The physician would simply submit the corresponding code for the service provided, and Medicare reimburses accordingly.

125.    When a patient presents for reasons other than a procedure, then it would be appropriate to bill simply for that office visit.

126.    If a patient presents for a specific procedure, and then during that appointment raises another health concern with a physician, it can be appropriate to bill for a separate office visit.

127.    Dr. Tareen began a practice of separating office visits unnecessarily in order to bill government payors for a separate unnecessary visit that otherwise would not have occurred.

31

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

128.   Patients were being seen for follow-up appointments and then were also prescribed additional phototherapy or other laser treatments. Dr. Tareen attempted to bill for this interaction as two separate appointments, but these billings were routinely denied as the follow-up exam was incorporated into the treatment visit.

129.   Once the billing denials became known to her, Dr. Tareen directed staff to separate the appointments for government-pay patients to differing days so that she could bill for each visit individually.

130.   For example, on June 20, 2017, Dr. Tareen instructed Relator Cremin and her colleague J.M. to "make it your job for the next week to make sure that no follow-ups are scheduled on laser or photo days. Please explain that they are not being covered and the patient has a higher chance of an out of pocket bill thanks."

131.   Dr. Tareen frequently used codes 99213 and 99214 for these office visits.

132.   Rather than appropriately bill for the one appointment which covered the services rendered, Dr. Tareen separated the visits out and then informed patients that the follow up visit was necessary to avoid out of pocket costs themselves, causing unnecessary follow up appointments.

133.   Dr. Tareen generally billed these visits under level 3 and 4 billing codes as more complicated office visits.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| Level | Medicare Billing Code | Average Charges Submitted to Medicare by Dr. Tareen |
|-------|----------------------|-----------------------------------------------------|
| 3 | 99213 | $141 |
| 4 | 99214 | $205 |

134.   For 2014-2016, Dr. Tareen was in the top 20% nationally for billing under code 99213. Each year from 2014-2019 Dr. Tareen billed hundreds of services, while her other colleagues at Tareen Dermatology generally billed between 20-178 in any given year.

135.   During her employment Relator Polzin learned that during the COVID-19 pandemic, and while she was a Billing Specialist, Defendants billed all telehealth "office" visits under code 99214, without the proper documentation, including required specifications as to the duration of the visits.

136.   Defendants billed for medically unnecessary office visits, which resulted in false and/or fraudulent claims being submitted to government payors in violation of the FCA.

## VI.   Defendants Provided Kickbacks to Patients by Routinely Waiving Co-Payments and Co-Insurance

137.   During Relators employment with Tareen Dermatology, and during separate time periods, they each observed a systemic practice of routine co-pay waivers for patients without any good faith effort to determine financial need.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

138.   The AKS prohibits offering or paying any remuneration "to any person to induce such person to purchase ... any good ... for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(2)(B).

139.   Many of the dermatological procedures done at Tareen Dermatology required multiple visits each week by patients.

140.   To induce patients to accept these repeat services, Defendants implemented a policy to have patients sign a hardship form, regardless of their actual financial condition.

141.   Dr. Tareen directed Relator Cremin and her colleague A.B., to have government-pay patients seen for laser and phototherapy services at Tareen Dermatology sign a Financial Hardship Agreement (FHA), so that they could be seen without having to make co-payments and co-insurance payments. Defendants granted this routine waiver with no determination, on a case-by-case basis or otherwise, that financial need justified the waivers.

142.   Relator Polzin received similar directives by Defendants during her employment in 2021.

143.   By doing this, Defendants routinely waived co-pays and co-insurance payments otherwise required from each patient for the office visits and services provided. Further, Defendants saved time that would have been expended on explaining co-payment, co-insurance, and deductible charges to patients.

144.   Not only did Defendants fail to engage in the required case-by-case analysis to determine whether co-pay and co-insurance waivers were appropriate, but Defendants'

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

conduct also provided remuneration to those patients regardless of need. Defendants' solicitation further increased the number of services for which they could bill government payors.

145.   Defendants' routine waiver of co-pays and co-insurance payments violated the AKS, thereby causing false and/or fraudulent claims to be submitted to government payors in violation of the FCA.

### VII.   Defendants Provided Kickbacks for Patient Referrals

146.   Defendants have on-site non-pharmacy dispensaries located at each of Defendants' locations (Roseville, Faribault, and Maplewood). Each non-pharmacy dispensary site has a unique NPI based on its location—Roseville: 1063782621, Faribault: 1215479530, Maplewood: 1851856504.

147.   These non-pharmacy dispensaries were available for patients to fill and re-fill all dermatology-related medications (i.e. antibiotics, topical creams, ointments, Accutane, etc.). Defendants had open conversations in the presence of Relators and other employees about how to make these dispensaries more profitable.

148.   Defendants began to offer employees "Tareen Bucks" or "Tareen Dollars" that employees could earn by having their patients fill their prescriptions at the Tareen Pharmacy.

149.   One "Tareen Dollar" was awarded per prescription filled, but three "Tareen Dollars" were given for each Accutane prescription filled. If the Accutane prescription was

more than one box, due to a higher dosage requirement for the patients, there was an additional three "Tareen Dollars" per box.

150.   Defendants' Pharmacy Director M.Y. tracked employees' earning based on their patient referrals. "Tareen Dollars" could be use by employees to obtain cosmetic products and procedures, including laser therapy and disport injections, from Tareen Dermatology. These products and services range from $20 to hundreds of dollars.

151.   Defendants made a similar offering to patients with "Dispensary Rewards Certificates." When patients filled a certain number of prescriptions at Defendants' in-house dispensaries, they earned a rewards certificate for use in the cosmetic department, as depicted below:



152.    Defendants' inducements to patients and employees for referrals to their non-pharmacy dispensaries violated the AKS, thereby causing false and/or fraudulent claims to be submitted to government payors in violation of the FCA.

153.    Additionally, Defendants provided bonuses to employees, including physician assistants, for their referrals of patients to Defendants' cosmetic department. To the extent these patients were government-pay beneficiaries who received fraudulent medical services from the cosmetic department, as described above, these bonuses violated the AKS, thereby causing false and/or fraudulent claims to be submitted to government payors in violation of the FCA.

154.    Additionally, Defendants paid bonuses to employees of $1 to $2 for each laser/phototherapy treatment provided to patients.  To the extent these patients were government-pay beneficiaries, these bonuses violated the AKS.

**VIII.  Defendants Submitted False and/or Fraudulent Bills under Dr. Tareen's NPI.**

155.    Shortly after Relator Polzin began her employment in the billing department, she became aware that Defendants were falsely and/ or fraudulently submitting claims for payment for patients under Dr. Tareen's NPI.

156.    Relator Polzin grew particularly concerned with the billing for Defendants' physician assistants, because it was not compliant with "incident to" requirements. Defendants employed several physician assistants, including K.H., K.S., M.P., S.W., L.S.,

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

B.M., and H.D, each of whom has his or her own NPI. However, their services were billed under Dr. Tareen's NPI.

157.    When Relator Polzin raised concerns to Davis, she was told that billing was done that way because Defendants get paid more. Trying to assuage Relator Polzin's concerns, Davis informed her that Dr. Tareen signed and closed chart notes for those patients. Davis further told her that Executive Director Tammi Salwei had "OK'd" the practice. Relator Polzin knew, however, those actions did not satisfy the "incident to" requirements.

158.    During her employment, Relator Polzin observed that in most instances physician assistants, not Dr. Tareen, conducted the initial assessments. Yet, when she and others were submitting these claims for payment, only Dr. Tareen's NPI was listed.

159.    Relator Polzin observed that patients' chart notes indicated that patients were seen by physician assistant "Name," but stated the billing should be under "Dr. Mohiba Tareen."

160.    Relator Polzin observed that Defendants' Maplewood and Faribault locations submitted claims under Dr. Tareen's NPI for work done by physician assistants at those locations. Dr. Tareen worked primarily at Defendants' Roseville location, and so could not have been present to provide the direct supervision required.

161.    Relator Polzin observed on multiple occasions that services rendered by physician assistants were billed under Dr. Tareen's NPI, even when Dr. Tareen was on

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

vacation. Relator Polzin recalls a time in the late summer of 2021, when Dr. Tareen was in Paris, France, but claims were still being processed using her NPI.

162.   At no time from June 2021 through October 2021 did Relator Polzin observe any claims being processed directly under a physician assistant's NPI, nor was any physician assistant's NPI noted anywhere on CMS Form 1500.

163.   In the mid-to-late fall of 2021, an email was sent to the billing department by Davis stating that "effective immediately," Defendants were going to change their practice and submit claims under the physician assistants' NPIs.

164.   Shortly after, however, a follow up email was sent, instructing staff to continue billing under Dr. Tareen's NPI when a physicians' assistant was not credentialed with a particular payor.

165.   Defendants' false and/or fraudulent billing under Dr. Tareen's NPI, and in violation of "incident to" billing requirements, caused the government to pay Defendants a 10-15% higher reimbursement than they are entitled to.

### IX.   Defendants' Billing Practices are Anomalous

166.   Dr. Tareen's billings are far higher than any other physician at Tareen Dermatology, and her billings place her amongst the highest percentiles of Minnesota dermatologists in Medicare billings.

167.   In 2015, Dr. Tareen was in the 97th percentile of total payments to Medicare, a more than 50% increase since 2012.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| **Provider Comparison**  NATIONALLY  STATEWIDE |||
| How MOHIBA K. TAREEN MD compares to 211 other providers in Minnesota specializing in Dermatology: |||
| **2012** | Total Payments: **$54,253** | Number of Patients: **128** | Payments per Patient: **$424** |
| | 46th percentile statewide | 16th percentile statewide | 88th percentile statewide |

| **Provider Comparison**  NATIONALLY  STATEWIDE |||
| How MOHIBA K. TAREEN MD compares to 234 other providers in Minnesota specializing in Dermatology: |||
| **2015** | Total Payments: **$297,265** | Number of Patients: **475** | Payments per Patient: **$626** |
| | 97th percentile statewide | 82nd percentile statewide | 94th percentile statewide |

168.   For 2016-2019, Dr. Tareen's number of Medicare patients and total payments from Medicare increased every year.

| Year | NPI | Provider Name | Total Beneficiaries | Total Payments | Payments per Beneficiary |
|------|-----|---------------|---------------------|----------------|--------------------------|
| 2016 | 1740448117 | Mohiba Tareen | 644 | $438,635.31 | $681.11 |
| 2017 | 1740448117 | Mohiba Tareen | 816 | $556,866.98 | $682.44 |
| 2018 | 1740448117 | Mohiba Tareen | 961 | $576,467.25 | $599.86 |
| 2019 | 1740448117 | Mohiba Tareen | 1,522 | $1,385,131.72 | $910.07 |

169.   Of particular note, Dr. Tareen's most numerous procedures in 2015 came from office visits, biopsy removal, and laser treatments.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

| Procedure | Number performed ▼ | Number of Medicare patients | Average Medicare reimbursement per procedure | Total Medicare payments for procedure |
|---|---|---|---|---|
| Destruction of 2-14 skin growths<br>Surgeries and procedures<br>CODE: 17003-O<br>Top 40% nationally | 1,015 | 163 | $4.31 | $4,375 |
| Established patient office or other outpatient visit, typically 15 minutes<br>Evaluation and management<br>CODE: 99213-O<br>Top 20% nationally | 832 | 369 | $53.72 | $44,695 |
| Biopsy of each additional growth of skin and/or tissue<br>Surgeries and procedures<br>CODE: 11101-O<br>Top 20% nationally | 635 | 237 | $25.03 | $15,894 |
| Biopsy of single growth of skin and/or tissue<br>Surgeries and procedures<br>CODE: 11100-O<br>Top 20% nationally | 498 | 355 | $68.69 | $34,208 |
| Destruction of skin growth<br>Surgeries and procedures<br>CODE: 17000-O<br>Top 40% nationally | 376 | 227 | $34.34 | $12,912 |
| Injection, triamcinolone acetonide, not otherwise specified, 10 mg<br>Drugs<br>CODE: J3301-O<br>Top 40% nationally | 247 | 53 | $1.32 | $326 |
| Laser treatment (total area less than 250 sq centimeters) for inflammatory skin disease<br>Exams and medical services<br>CODE: 96920-O<br>Top 40% nationally | 226 | 16 | $122.64 | $27,717 |

170.    Similarly, Dr. Tareen's most numerous procedures 2016-2019 came from office visits, biopsy removal, and laser treatments.

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2016 | 17003 | Destruction of 2-14 skin growths | 220 | 1200 | $5,112.00 |
| 2016 | 99213 | Established patient office or other outpatient visit, typically 15 minutes | 518 | 1172 | $63,112.20 |
| 2016 | 11101 | Biopsy of each additional growth of skin and/or tissue | 1048 | 1048 | $26,147.60 |
| 2016 | 11100 | Biopsy of single growth of skin and/or tissue | 500 | 703 | $49,006.13 |
| 2016 | 17000 | Destruction of skin growth | 322 | 552 | $18,271.20 |
| 2016 | 96920 | Laser treatment (total area less than 250 sq centimeters) for inflammatory skin disease | 24 | 418 | $51,267.70 |

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2016 | 96910 | Skin application of tar and ultraviolet B or petrolatum and ultraviolet B | 17 | 382 | $21,785.46 |
| 2016 | 17110 | Destruction of up to 14 skin growths | 218 | 312 | $25,693.20 |

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2017 | 99213 | Established patient office or other outpatient visit, typically 15 minutes | 696 | 1,581 | $83,034.12 |
| 2017 | 17003 | Destruction of 2-14 skin growths | 280 | 1,273 | $5,435.71 |
| 2017 | 11101 | Biopsy of each additional growth of skin and/or tissue | 417 | 1,187 | $29,556.30 |
| 2017 | 96920 | Laser treatment (total area less than 250 sq centimeters) for inflammatory skin disease | 42 | 905 | $109,894.15 |
| 2017 | 11100 | Biopsy of single growth of skin and/or tissue | 610 | 826 | $56,019.32 |
| 2017 | 96910 | Skin application of tar and ultraviolet B or petrolatum and ultraviolet B | 37 | 780 | $43,765.80 |
| 2017 | 17000 | Destruction of skin growth | 411 | 653 | $21,705.72 |
| 2017 | 17110 | Destruction of up to 14 skin growths | 280 | 413 | $33,217.59 |

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2018 | 99213 | Established patient office or other outpatient visit, typically 15 minutes | 797 | 1,614 | $83,250.12 |
| 2018 | 17003 | Destruction of 2-14 skin growths | 301 | 1,366 | $5,464.00 |
| 2018 | 11101 | Biopsy of each additional growth of skin and/or tissue | 456 | 1,036 | $25,837.84 |
| 2018 | 11100 | Biopsy of single growth of skin and/or tissue | 695 | 922 | $63,959.14 |
| 2018 | 17000 | Destruction of skin growth | 468 | 756 | $25,908.12 |
| 2018 | 96910 | Skin application of tar and ultraviolet B or petrolatum and ultraviolet B | 46 | 743 | $66,572.80 |

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2018 | 96920 | Laser treatment (total area less than 250 sq centimeters) for inflammatory skin disease | 52 | 538 | $67,562.04 |
| 2018 | 17110 | Destruction of up to 14 skin growths | 305 | 403 | $33,469.15 |

| Year | HCPCS Code | HCPCS Description | Number of Patients | Number Performed | Total |
|---|---|---|---|---|---|
| 2019 | 99213 | Established patient office or other outpatient visit, typically 15 minutes | 1,254 | 2,532 | $134,955.60 |
| 2019 | 17003 | Destruction of 2-14 skin growths | 536 | 2,249 | $9,873.11 |
| 2019 | 96910 | Skin application of tar and ultraviolet B or petrolatum and ultraviolet B | 80 | 1,642 | $151,589.44 |
| 2019 | 96920 | Laser treatment (total area less than 250 sq centimeters) for inflammatory skin disease | 82 | 1,418 | $186,112.50 |
| 2019 | 11102 | Tangential biopsy of single skin lesion | 1,035 | 1,379 | $91,000.21 |
| 2019 | 11103 | Tangential biopsy of additional skin lesion | 615 | 1,373 | $58,228.93 |
| 2019 | 17000 | Destruction of skin growth | 811 | 1,295 | $44,742.25 |
| 2019 | 88305 | Pathology examination of tissue using a microscope, intermediate complexity | 334 | 743 | $18,077.19 |

171.    Absent Defendants' fraudulent schemes, which both Relators observed during their respective periods of employment, it is unlikely Defendants would have been able to bill such volumes to Medicare.

172.    Dr. Basir Tareen was aware of this anomalous billing through his role as CEO of Tareen Dermatology, P.A. As CEO, and as an owner along with his wife, Dr. Mohiba Tareen, Dr. Basir Tareen was heavily involved in the operations of the office.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

173.   For example, on May 8, 2015, Dr. Basir Tareen emailed Relator Cremin and Dr. Tareen, among others, asking for a "list of specific patients and their comments or complaints regarding excimer treatment. (per our discussion yesterday)."

174.   Dr. Basir Tareen was a part of administrative discussions regarding patient billing, including billing to government payors. For example, in December 2017, Dr. Basir Tareen was a part of an "admin discussion" email chain discussing changing codes for laser therapy patients.

175.   For example, on October 25, 2021, Dr. Basir Tareen emailed Relator Polzin, Dr. Mohiba Tareen, and others, regarding how to calculate time for purposes of billing under CPT codes 99441, 99442, and 99443.

176.   Dr. Basir Tareen's function as CEO, and his conduct, examples of which are cited above, demonstrate that he was at least aware of, if not a facilitator of the fraudulent conduct. Further, Relator Cremin is aware that Dr. Basir Tareen finalized and signed off on laser and phototherapy patients' electronic medical records (EMRs) on behalf of Dr. Tareen, by using her credentials and NPI, and then submitted those claims to S.H. to bill to the patients' insurance, including Medicaid, Medicare, and TRICARE.

177.   Defendants' anomalous billings continued into at least 2021. Relator Polzin learned this from an external audit conducted on claims Defendants submitted, the results of which were sent to Defendants' general billing email to which she had access because of her role.

178.    The audit specifically referenced photochemotherapy and laser CPT codes 96910, 96920, 96923, and 96922, and found Defendants billings were "higher than the expected billing distribution by the average billing behavior of other professionals within [their] peer group by 98 to 99%."

## X.    Defendants' Conduct Violates the FCA

179.    Defendants violated the FCA by 1) up-coding services rendered in order to increase the reimbursement amount received, 2) providing medically unnecessary services, 3) providing kickbacks to patients and employees in violation of the AKS; and 4) falsely billing for services under Dr Tareen's NPI.

180.    Statutes and regulations prohibit Medicaid, Medicare, TRICARE, and other government payors from reimbursing providers for medically unnecessary services.

181.    Up-coding services amounts to billing for services that were never rendered, which constitutes a paradigmatic "false or fraudulent claim."

182.    The routine waiver of co-pays and co-insurance payments is a per se violation of the FCA as it is a violation of the AKS.

183.    The provision of bonuses and other inducements, including "Tareen Dollars," to employees for referrals to Defendants' pharmacy and cosmetic department is a per se violation of the FCA as it is a violation of the AKS.

184.    Submitting claims for services rendered under the NPI of a provider who did not provide those services and did not comply with "incident to" requirements constitutes a paradigmatic "false or fraudulent claim."

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

185.   When submitting or causing the submission of these false and/or fraudulent claims, Defendants acted knowingly, or at least with reckless disregard, in carrying out their various schemes in order to fraudulently maximize the amount of money received from government payors. As noted above, when claims were being denied, Defendants knowingly changed the codes or moved patients' appointments in order to ensure reimbursement, regardless of whether the service was medically necessary or actually provided at all. Moreover, Defendants' routine waiver of co-pays and co-insurance was intended to induce patients to continue utilizing services at Tareen Dermatology. Defendants' provision of bonuses and other inducements to employees was similarly intended to induce patients to utilize services at entities Defendants owned.

186.   As sophisticated providers of healthcare services, Defendants were obligated by law and by contract to know and comply with all applicable laws, regulations, and programs instructions, including Medicare, Medicaid, and TRICARE, when submitting claims for payment. In fact, for each claim submitted, Defendants certified that the "information is true, accurate, and complete," and that they understood "payment of this claim will be from Federal and funds, and that any falsification or concealment of a material fact, may be prosecuted under Federal and State laws."[13]

187.   On several occasions, when staff noted to Defendants that certain claims were not being paid, Defendants were quick to direct them to engage in the conduct described above, including changing diagnosis codes. The fact that claims were initially

---

[13] 42 C.F.R. § 455.18; CMS Form 1500.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

denied demonstrates that government payors are only authorized and permitted to pay for untainted, medically necessary services, that were appropriately provided to patients. Defendants' conduct therefore has a natural tendency to influence, or is capable of influencing, the payment or receipt of money or property by the government.

188.   Accordingly, by 1) up-coding services rendered in order to increase the reimbursement amount received, 2) providing medically unnecessary services, 3) providing kickbacks to patients and employees in violation of the AKS, and 4) falsely billing for services under Dr Tareen's NPI, Defendants submitted false and/or fraudulent claims and caused the Government to pay money it otherwise would not have paid.

## XI.   Defendants' Fraud is Material

189.   The Government has pursued multiple FCA cases and other enforcement actions against healthcare providers for up-coding.[14]

190.   In connection with a settlement of one of those cases, the Government's counsel stated: "Charging the government for more costly services than what the patient actually needs and billing the government for more serious diagnoses than what the patient actually has is a waste of taxpayer dollars. Those who engage in these practices will be held accountable."[15]

---

[14] *See, e.g.,* https://www.justice.gov/usao-ndga/pr/government-files-false-claims-act-complaint-against-ophthalmologist-dr-aarti-d-pandya#:~:text=Pandya%2C%20M.D.%2C%20P.C.%20(%E2%80%9C,cases%2C %20not%20provided%20at%20all.; https://www.justice.gov/usao-ndil/pr/chicago-area-physical-therapy-center-and-4-nursing-facilities-pay-97-million-resolve; https://www.justice.gov/usao-ma/pr/carewell-urgent-care-center-agrees-pay-2-million-resolve-allegations-false-billing; https://www.justice.gov/usao-ma/pr/newton-physician-pay-680000-resolve-allegations-medicare-and-medicaid-fraud; https://www.justice.gov/usao-edpa/pr/prime-healthcare-services-and-ceo-dr-prem-reddy-pay-125-million-settle-false-claims-act.

[15] https://www.justice.gov/usao-edpa/pr/prime-healthcare-services-and-ceo-dr-prem-reddy-pay-125-million-settle-false-claims-act

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

191.   The Government has also pursued multiple FCA cases and other enforcement actions against healthcare providers for billing for medically unnecessary services, including a $40.5 million settlement of a *qui tam* lawsuit against a large durable medical equipment provider that billed Medicare for the rental of costly non-invasive ventilators to program beneficiaries who were not using the ventilators such that the devices were not medically necessary.[16]

192.   In announcing the settlement, the Government's counsel stated: "It is critical to the financial integrity of federal health programs like Medicare and Medicaid that reimbursements are made only for medically necessary items and services. [Durable medical equipment] providers ... have an obligation to ensure that the equipment and devices they rent to patients are medically necessary."[17]

193.   In announcing the Government's intervention in another FCA case based on a lack of medical necessity, government counsel stated: "Patients and taxpayers who finance health care programs like Medicare are entitled to know that doctors are making decisions solely based upon medical need, and not based upon a desire to increase billings."[18]

194.   The Government has also used the FCA to pursue those who offer kickbacks and health care providers who accept them. A pertinent example is the Government's

---

[16] https://www.justice.gov/usao-sdny/pr/acting-manhattan-us-attorney-announces-405-million-settlement-durable-medical-equipment.

[17] *Id.*

[18] https://www.justice.gov/usao-ndga/pr/government-files-false-claims-act-complaint-against-ophthalmologist-dr-aarti-d-pandya#:~:text=Pandya%2C%20M.D.%2C%20P.C.%20(%E2%80%9C,cases%2C%20not%20provided%20at%20all.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

intervention in *United States ex rel. BNHT, LLC v. Life Spine, Inc.*, 18 Civ. 1311 (JSR) (S.D.N.Y) because Life Spine "flagrantly ignored the law by paying surgeons millions of dollars in fees and royalties to get them to use Life Spine products during spinal surgeries."[19]

195.    When the case settled, the Government's counsel explained that "such conduct seriously undermines the public's confidence in medical treatment decisions made by doctors whose judgment may be compromised by illegal kickbacks" and that the Government "will continue vigorously to pursue companies and individuals who pay health care providers to induce them to use their products or services."[20]

196.    The Government has also pursued FCA cases against healthcare providers for NPI fraud or similar credentialing-related fraud.

197.    As one example, in 2017, an Oklahoma physician agreed to pay the Government $580,000 to resolve allegations that the physician violated the FCA because the physician allowed the company that employed him to use his NPI to bill Medicare for physical therapy evaluation and management services rendered by other providers.[21]

198.    Also, CityMD, the largest urgent care company in the New York area, paid over $6.6 million in 2018 to resolve FCA allegations brought by a relator and the

---

[19] https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-files-lawsuit-against-spinal-implant-company-its-ceo-and-another.

[20] https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-settlement-lawsuit-against-spinal-implant-company-its.

[21] https://www.justice.gov/usao-wdok/pr/oklahoma-doctor-agrees-pay-580000-settle-allegations-submitting-false-claims-medicare

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

Government that non-credentialed physicians billed the Government using the NPI numbers of physicians who did not provide the services.[22]

199.   In announcing the settlement, the Government's counsel stated: "CityMD improperly billed Medicare at significant cost to taxpayers. This settlement holds CityMD accountable both through the significant monetary payment and the detailed admissions made by CityMD."[23]

200.   As another example, a West Virginia hospital paid the Government over $320,000 in 2021 to resolve the hospital's self-disclosure that it had filed claims for services performed by a non-credentialed physician who used the NPI of a credentialed physician.[24]

201.   In announcing the settlement, the Government's counsel stated: "This case was the result of the hospital recognizing the mistake and bringing it to the attention of the federal government. I commend the hospital management for ensuring that this wrong was righted. All medical providers should take note, and when a mistake in billing is made, report the issue immediately."[25]

202.   In connection with a settlement of another FCA case involving credentialing fraud, a Special Agent in Charge at HHS' Office of Inspector General stated: "Taxpayers and Medicare patients rightly expect medical providers to be properly credentialed before

---

[22] https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-66-million-settlement-against-citymd-submitting-false
[23] *Id.*
[24] https://www.justice.gov/usao-ndwv/pr/west-virginia-hospital-pay-more-300000-medicare-fraud
[25] *Id.*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

billing for their services. Working with our law enforcement partners, we will continue protecting Federal healthcare programs."[26]

203.   Echoing these sentiments and enforcement priorities, the Government's counsel stated: "When healthcare companies do business with the federal government, they must follow the rules like everyone else. All companies with this distinction – regardless of size – should honor their commitment to provide competent care to the full letter of the law. Our office will continue to protect tax dollars and ensure the rule of law is followed."[27]

204.   These enforcement efforts and the statutes, regulations, and other billing requirements set forth above demonstrate that Defendants' fraud is material for purposes of the FCA.

## XII.   Defendants' Retaliated Against Relator/Plaintiff Polzin

205.   Relator/Plaintiff Polzin has been working in the medical billing field for over 30 years. She was hired by Tareen Dermatology as a Billing Specialist after being interviewed by Director of Finance, Cheryl Davis, and Executive Director, Tammi Salwei. She began her employment on June 1, 2021.

206.   Polzin understood that she and five other billing specialists were hired so that Defendants could bring billing services in-house. She was excited to begin the job and bring her experience to bear in building the new billing department.

---

[26] https://www.justice.gov/usao-sc/pr/south-carolina-s-largest-urgent-care-provider-and-its-management-company-pay-225-million
[27] *Id.*

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

207.   During Polzin's interview, she discussed leaving a past employment position due to "questionable" billing practices. She was reassured that "questionable" billing practices would not be a worry at Tareen Dermatology. However, Polzin realized almost immediately that was not the case.

208.   Soon after starting her employment with Defendants, while shadowing various departments, Polzin learned that Defendants routinely waived co-payments or co-insurance for all patients seen by Defendants receiving SRT and Laser/Phototherapy services. She learned this in conversation with front desk staff, who told her that Defendants provided FHAs to all patients so that co-payments and co-insurance could be avoided. Polzin understood this practice encouraged patients to continue using Defendants' services.

209.   She also learned that day that Defendants were billing Medicaid patients for "no show" appointments, as much as $50—a practice Polzin understood was prohibited.

210.   Right away, Polzin raised her concern about billing Medicaid patients for "no show" appointments. Polzin expressed this concern to Davis, who responded that she would speak with Defendant Mohiba Tareen and Defendant Basir Tareen. Davis also asked Polzin for documentation supporting her concerns, which she provided.

211.   Later that week, Polzin reported to Davis that the waiver of co-payments and co-insurance was not allowed, informing Davis that this practice was illegal and violated insurance requirements. To help support her position, Polzin explained that a federally-qualified healthcare center at which she previously worked served the most indigent of

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

persons, and even then, hardship waivers were only used on a case-by-case basis. Davis dismissed Polzin's concern, and simply responded "it's her practice," referring to Dr. Tareen.

212.   Later, Polzin was provided with a copy of Defendants "Special Adjustments" documentation. That document provided special instructions for "laser/phototherapy" and "SRT" procedures. The document stated in part, "We waive/adjust/writeoff if a signed Financial Hardship Application is on file (FHA)." It specified waiver of 1) co-pays and 2) "coinsurance of 80/20 or less. If their policy is 70/30, we do not adjust."

213.   In fact, as demonstrated below, Defendants provided patients who came into the office with FHA forms that already had the service marked claiming hardship, and they were simply instructed to sign it.



214.   After November 1, 2021, Defendants routinely mailed a similar FHA form to patients for execution, as well as a "sliding fee" application.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

215.   Additionally, in July or August 2021, Polzin and others were instructed to change diagnosis codes, as similarly observed by Relator Cremin, to enable Defendants to justify billing private and government-pay insurance for the services being provided. During weekly team "Huddles," instructions were put on a whiteboard indicating that in order for a certain procedure to be covered, it must correspond to a particular diagnosis – regardless of what the patient actually presented with.

216.   Knowing such conduct was fraudulent, Polzin refused, and told Davis she would not alter diagnosis codes because it was improper.

217.   In Polzin's first weeks of employment, she quickly realized that of the new billing specialists who had been hired with her, she had the most relevant billing experience. At least three of the other billing specialists had little to no experience in medical billing. One billing specialist even told Polzin, "I don't know how I got this job, I don't know anything about billing." It became clear to Polzin that Defendants sought billing specialists who simply did what they were told without question, regardless of whether the practice was compliant with billing requirements.

218.   During another team "Huddle" in mid-summer 2021, the routine waiver of co-payments or co-insurance was discussed. During the meeting Polzin again raised concerns to Davis about the practice. Polzin questioned that if the waiver was indeed based on actual patient hardship, then why were Defendants focused on "80/20 deductibles," which Polzin understood were Medicare patients. Rather than address her concern, Polzin was reprimanded for having a "negative attitude" about the practice.

219.   Shortly after Polzin voiced her concerns during the team "Huddle," Defendants sent an email with the subject "Waiving of Co-pays, Co-Insurance and FHAs." The email stated, "effective immediately, we will no longer be waiving Co-Pays or Co-Insurance for patients." Polzin felt as though Defendants had perhaps actually heard her concerns. However, the email also provided multiple exceptions to the claimed prohibition on routine waivers that continued to concern Polzin.

220.   At times when raising her concerns, Polzin told to Davis that she was "a rule follower," who simply wanted to do things the correct way. Davis responded by saying, "Yes, I know you're a rule follower," in a manner that implied that Polzin's efforts to get Defendants to engage in compliant billing practices were not well received.

221.   On August 4, 2021, Polzin was again reprimanded for making "negative comments." During a conversation with a co-worker about unscheduled breaks, Polzin stated words to the effect of, "it's not the only thing illegal we do around here." In response, a meeting was held with Davis, Salwei, and Business Office Manager, Ashley Dibble-Defer to discuss Defendants' "growing concern" with how Polzin's "negative comments" were impacting the work environment.

222.   During the meeting, Polzin was instructed to refrain from having "conversations that negatively impact her co-workers." Polzin understood that the comments Defendants were characterizing as "negative" were actually about Defendants' fraudulent billing practices.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

223. As a result of the meeting, Polzin was placed on a one-month probation period and was threatened with potential termination if she did not make "sufficient progress."

224. Polzin believed this discipline was in retaliation for raising concerns about Defendants' fraudulent billing practices.

225. Aside from the criticism of her "negative" comments, Davis and others regularly praised Polzin's work performance. Davis told Polzin that she had been hired for her "experience and knowledge" regarding medical billing and that Polzin was the "only one [Davis] could depend on coming into work."

226. After Defendants wrote up Polzin on August 4, 2021, for her "negative" comments about Defendants' illegal practices, she became more cautious about speaking out. But she continued to refuse to participate in Defendants various fraudulent billing schemes.

227. In September 2021, not long after writing up Polzin, Defendants moved her out of the billing department with her colleagues and into an empty exam room modified to function as a work space. She spent the remainder of her employment isolated in that room with little to no interaction with her colleagues. Polzin believed this, too, was punishment for her reports of and refusal to participate in Defendants fraudulent conduct.

228. Polzin successfully completed her one-month probation in early September 2021.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

229.   Polzin remained steadfast in voicing her concerns, refusing to participate in Defendants' fraudulent conduct and trying to persuade Defendants to correct their non-compliant conduct. Defendants' response was not to change their behavior, but to consistently characterize Polzin as being "negative."

230.   In the fall of 2021, Polzin raised concerns with Davis about excessive biopsies Defendants were doing and about the improper billing that occurred when an outside lab was providing part of the service, as described above. Polzin told Davis that she would not participate in processing those billings, but observed that the other billing specialists followed Defendants' illegal directions.

231.   In October 2021, new Billing Specialist L.H. was on a call with a patient who asked about having a co-payment waived. Polzin was nearby, and L.H. asked her about the practice and how to respond. Polzin referred the July 2021 email stopping the routine waiver practice, but was quickly interrupted by B.W., who told L.H. that the practice had been extended through November. B.W. also stated that she continued to mail FHA forms to patients. This was the first Polzin had heard the waiver practice was still on-going, despite her previous reports and Defendants' July email. Polzin believed Defendants had intentionally kept her in the dark so she would not know the practice was still happening.

232.   Polzin again went to Davis to report her concerns that the routine waiver of co-payments and co-insurance was improper. Davis only responded that she would talk to B.W.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

233.   In November 2021, the legitimacy of Polzin's on-going concerns with Defendants' fraudulent billing practices was reinforced when B.W. stated during a team "Huddle" that she had told a patient Defendants had stopped waiving co-payments and co-insurance because it was "illegal."

234.   On December 9, 2021, Polzin was again reprimanded for making "negative comments." On this occasion, Polzin was working with a new Billing Specialist, K.F. She asked Polzin some questions related to Defendants' billing practices, including the routine waiver of co-payments and co-insurance. Polzin answered the questions honestly based on her experience, including that she believed the practice was illegal.

235.   Dibble-Defer overheard this conversation, and then called a meeting with Davis and K.F. to learn more about what Polzin had said. Polzin did not know about the meeting until after she was terminated. According to a document placed in Polzin's file without her knowledge, K.F. allegedly told Davis and Dibble-Defer that Polzin had talked about Defendants' illegal conduct and Tareen Dermatology's resistance to change.

236.   On December 13, 2021, Davis, Salwei, and Dibble-Defer called Polzin to a meeting and terminated her.

237.   During the meeting, Polzin was told that Dibble-Defer had overheard her discuss Defendants' illegal conduct with K.F., and that it was inappropriate to discuss such things, especially with a new employee. Polzin was told that she should have directed any billing questions to Dibble-Defer. Polzin was then told she was not a "good fit," and was terminated.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

238.   Tareen Dermatology, P.A. tried to cloak its real reasons for her termination—Polzin's unwillingness to participate in Defendants' fraudulent schemes and her persistence in reporting and trying to eliminate those schemes—by labelling her conduct as "negative" and lacking "fit."

239.   Late that same evening, Polzin emailed Salwei requesting 1) the truthful reason for her termination, 2) a copy of her personnel file, and 3) an earnings statement for her final paycheck. Although Defendants provided her a copy of her personnel file, they have failed to provide her with the truthful reason for her termination as required by law.

240.   Polzin began her position at Tareen Dermatology, P.A. with excitement to participate in the building of a compliant medical billing department. She had every intention of working there until she retired at age 70, when her Social Security had fully vested, or even later. However, in the months leading up to her retaliatory termination, she experienced much stress and anxiety as her reports of illegal conduct were met with little more than consistent reprimand and accusations that she was creating a "negative" work environment. The constant concern about being reprimand for trying to report and stop Defendants fraudulent conduct consumed her thoughts during and after work hours and caused her difficulty sleeping and difficulty enjoying her normal life activities.

241.   As a result of the retaliation she experienced, up to and including her termination, Polzin has been significantly harmed. She has lost back and front pay, was denied substantial benefits, and suffered emotional distress as a result of Defendants' illegal treatment.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(l)(A) – False or Fraudulent Claims
### (Against All Defendants)

242.    Relators reallege and incorporate by reference paragraphs 1 through 241 of this First Amended Complaint.

243.    By the acts described above, Defendants knowingly presented or caused to be presented, materially false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

244.    Knowingly presenting or causing to present a materially false or fraudulent claim for payment or approval renders Defendants liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

245.    Furthermore, had the Government actually known of the false or fraudulent nature of the claims, it would have been prohibited by law from making the corresponding payments.

246.    The Government, however, was unaware of the false or fraudulent nature of the claims Defendant presented or caused to be presented.

247.    Because of the materially false or fraudulent claims Defendants presented or caused to be presented, the Government paid the corresponding claims.

248.    The United States, unaware of the falsity or fraudulent nature of the claims presented or caused to be presented by Defendants, paid for claims that otherwise would not have been paid because of Defendants' provision of 1) medically unnecessary services,

2) up-coded services, and 3) kickbacks to patients in violation of the AKS, and 4) services rendered by Defendants' physician assistants under Dr. Mohiba Tareen's NPI.

249.    Because of Defendants' acts, and by reason of these payments and benefits given, the United States sustained damages and continues to be damaged in an amount to be determined at trial, and therefore is entitled to damages and penalties under the FCA.

**COUNT II**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(l)(B) – False Records or Statements**
**(Against All Defendants)**

250.    Relators reallege and incorporate by reference paragraphs 1 through 241 of this First Amended Complaint.

251.    By the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

252.    Knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval renders Defendants liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

253.    Had the Government actually known of the false or fraudulent nature of the records or statements, it would have been prohibited by law from making corresponding payments.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

254.   The Government, however, was unaware of the false nature of the records or statements.

255.   Because of the falsity of the records or statements, which were material to false or fraudulent claims submitted for payment or approval, the Government has been damaged in an amount to be determined at trial.

256.   As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendants are liable to pay treble actual damages pursuant to 31 U.S.C. § 3729(a).

## COUNT III
## VIOLATIONS OF THE MINNESOTA FALSE CLAIMS ACT
### Minn. Stat. § 15C.02(a)(1) and (2) – False or Fraudulent Claims and False Records or Statements
### (Against All Defendants)

257.   Relators reallege and incorporates by reference paragraphs 1 through 241 of this First Amended Complaint.

258.   By virtue of the acts alleged above, Defendants knowingly presented or caused to be presented, materially false or fraudulent claims for payment or approval in violation of Minn. Stat. § 15C.02(a)(1).

259.   By virtue of the acts alleged above, Defendants knowingly made, used, or caused to be made or used, materially false records or statements material to a false or fraudulent claim in violation of Minn. Stat. § 15C.02(a)(2).

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

260.    Had the State of Minnesota actually known of the false or fraudulent nature of the claims, records, or statements, it would have been prohibited by law from making the corresponding payments.

261.    The State of Minnesota, however, was unaware of the false or fraudulent nature of the claims, records, or statements.

262.    Because of the materially false or fraudulent claims Defendants presented or caused to be presented, the State of Minnesota paid the corresponding claims.

263.    Because of the falsity of the records or statements, which were material to false or fraudulent claims submitted for payment or approval, the State of Minnesota has been damaged in an amount to be determined at trial.

264.    The State of Minnesota, unaware of the falsity or fraudulent nature of the claims presented or caused to be presented by Defendants, paid and continues to pay amounts that otherwise would not be paid but for Defendants' fraudulent billing.

265.    Because of the Defendants' acts, and by reason of these payments and benefits given, the State of Minnesota sustained damages and continues to be damaged in an amount to be determined at trial.

## COUNT IV
## RETALIATION IN VIOLATION OF THE FEDERAL FALSE CLAIMS ACT ON BEHALF OF RELATOR/PLAINTIFF POLZIN
### (Against Defendant Tareen Dermatology, P.A.)

266.    Relator/Plaintiff Polzin realleges and incorporates by reference paragraphs 1 through 241 of this First Amended Complaint.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

267.   The FCA imposes liability upon "any person who - - (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. . ." 31 U.S.C. § 3729(a)(1)(A) and (B).

268.   The FCA provides that "any employee…shall be entitled to all relief necessary to make that employee…whole, if that employee…is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1).

269.   As set forth in detail in the preceding paragraphs, by reason of their fraudulent coding and billing practices, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to federal health care programs, and used, or caused to be used, false records or statements that were material to such fraudulent claims, all in violation of the FCA.

270.   As also set forth in the detail in the preceding paragraphs, Defendants discharged, threatened, harassed, or in any other manner discriminated against Relator/Plaintiff Polzin in the terms and conditions of her employment because of her lawful acts in reporting fraudulent conduct and efforts to stop Defendants' violations of the FCA, all in violation of 31 U.S.C. § 3730(h)(1).

271.   As a direct result of Defendants' unlawful retaliatory and discriminatory conduct in violation of 31 U.S.C. § 3730(h), Relator/Plaintiff Polzin has suffered damages for which she is entitled relief under 31 U.S.C. § 3730(h)(2).

**COUNT V**
**RETALIATION IN VIOLATION OF THE MINNESOTA FALSE CLAIMS ACT**
**ON BEHALF OF RELATOR/PLAINTIFF POLZIN**
**(Against Defendant Tareen Dermatology, P.A.)**

272.   Relator/Plaintiff Polzin realleges and incorporates by reference paragraphs 1 through 241 of this First Amended Complaint.

273.   The Minnesota FCA imposes liability upon "any person who - - (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. . ." Minn. Stat. § 15C.02(a)(1) and (2).

274.   The Minnesota FCA further provides that "any employee . . . is entitled to all relief necessary to make that employee . . . whole if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this chapter or other efforts to stop one or more violations of this chapter." Minn. Stat. § 15C.145

275.   As set forth in detail in the preceding paragraphs, by reason of their fraudulent coding and billing practices, Defendants knowing presented, or caused to be presented, false or fraudulent claims for Medicaid reimbursement, and used, or caused to

65

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

be used, false records or statements that were material to such fraudulent claims, all in violation of the Minnesota FCA.

276.   As also set forth in the detail in the preceding paragraphs, Defendant Tareen Dermatology, P.A. discharged, threatened, harassed, or in any other manner discriminated against Relator/Plaintiff Polzin in the terms and conditions of her employment because of her lawful acts in reporting fraudulent conduct and efforts to stop Defendants' violations of the Minnesota FCA, all in violation of Minn. Stat. § 15C.145.

277.   As a direct result of Defendant's unlawful retaliatory conduct, Relator/Plaintiff Polzin has experienced damages for which she is entitled relief under Minn. Stat. 15C.145(b).

**COUNT VI**
**RETALIATION IN VIOLATION OF THE MINNESOTA WHISTLEBLOWER**
**STATUTE, MINN. STAT. § 181.932 ON BEHALF OF RELATOR/PLAINTIFF**
**POLZIN**
**(Against Defendant Tareen Dermatology, P.A.)**

278.   Relator/Plaintiff Polzin realleges and incorporates by reference paragraphs 1 through 241 of this First Amended Complaint.

279.   For purposes of the Minnesota Whistleblower Act (MWA), the term "employee" means "a person who performs services for hire in Minnesota for an employer." Minn. Stat. § 181.931, subd. 2.

280.   For purposes of the MWA, the term, "employer" means "any person having one or more employees in Minnesota . . ." Minn. Stat. § 181.931, subd. 3.

Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)

281.     At all times material herein, Relator/Plaintiff Polzin and Defendant Tareen Dermatology, P.A. stood in the relationship of employee and employer within the meaning of the MWA.

282.     The MWA provides, in relevant part, that "[a]n employer shall not discharge, discipline, threaten, or otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(1)     the employee . . . in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official;"

***

(3)     the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason; [or]

(4)     the employee, in good faith, reports a situation in which the quality of health care services provided by a health care facility, organization, or health care provider violates a standard established by federal or state law or a professionally recognized national or clinical or ethical standard and potentially places the public at risk of harm;"

Minn. Stat. § 181.932, subd. 1(1), (3)-(4).

283.     As set forth in detail in the preceding paragraphs, Defendant Tareen Dermatology, P.A. discharged, disciplined, threatened, otherwise discriminated against, or penalized Relator/Plaintiff Polzin regarding her compensation, terms, conditions, location,

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

or privileges of employment because she reported, in good faith, Defendants' violations, suspected violations, or planned violations of federal and state laws, or common law, or rules adopted pursuant to law, including but not limited to Defendants' violations of the FCA, the Minnesota FCA, and the AKS. Thus, Defendants violated Minn. Stat. § 181.932, subd. 1(1).

284.   As set forth in detail in the preceding paragraphs, Defendant Tareen Dermatology, P.A. discharged, disciplined, threatened, or otherwise discriminated against, or penalized Relator/Plaintiff Polzin regarding her compensation, terms, conditions, location, or privileges of employment because she refused to participate in Defendants above-described fraudulent coding and/or billing practices when: (a) Relator/Plaintiff Polzin had an objective basis in fact to believe those practices violated a state or federal law or rule or regulation adopted pursuant to law including but not limited to the FCA, the Minnesota FCA, and the AKS; and (b) she informed Defendants that she was refusing to engage in the conduct for that reason. Thus, Defendants violated Minn. Stat. § 181.932, subd. 1(3)

285.   As set forth in detail in the preceding paragraphs, Defendant Tareen Dermatology, P.A. discharged, disciplined, threatened, or otherwise discriminated against, or penalized Relator/Plaintiff Polzin regarding her compensation, terms, conditions, location, or privileges of employment because she reported, in good faith, a situation in which the quality of health care services Defendants provided violated a standard

established by federal or state law or a professionally recognized national or clinical or ethical standard and potentially placed the public at risk of harm.

286.    As a direct result of Defendants' violations of the MWA, Relator/Plaintiff Polzin has sustained damages including loss of earnings and earning capacity, and has suffered and will continue to suffer emotional distress, embarrassment, humiliation, and loss of self-esteem. Relator/Plaintiff Polzin has also incurred attorneys' fees and expenses and other related damages. Relator/Plaintiff Polzin has experienced damages for which she is entitled to relief under Minn. Stat. § 181.935.

**COUNT VII**
**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY ON BEHALF**
**OF RELATOR/PLAINTIFF POLZIN**
**(Against Defendant Tareen Dermatology, P.A.)**

287.    Relator/Plaintiff Polzin realleges and incorporates by reference paragraphs 1 through 241 of this First Amended Complaint.

288.    Minnesota law recognizes a cause of action for wrongful discharge in violation of public policy, which protects individuals who, like Relator/Plaintiff Polzin, have been discharged for reporting violations the law.

289.    As set forth in detail in the preceding paragraphs, Defendants discharged Polzin after and because she reported their fraudulent billing schemes, which violated federal and state law, including the FCA and Minnesota FCA.

290.    As a direct result of Defendants' conduct, Relator/Plaintiff Polzin has sustained loss of earnings and earning capacity, and has suffered and will continue to suffer emotional distress, embarrassment, humiliation, and loss of self-esteem. Relator/Plaintiff

Polzin has also incurred attorneys' fees and expenses and other related damages. Relator/Plaintiff Polzin has experienced damages for which she is entitled to relief.

### COUNT VIII
### FAILURE TO PROVIDE TRUTHFUL REASONS FOR
### TERMINATION IN VIOLATION OF MINN. STAT. § 181.933
### ON BEHALF OF RELATOR/PLAINTIFF POLZIN
### (Against Defendant Tareen Dermatology, P.A.)

291.    Relator/Plaintiff Polzin realleges and incorporates by reference paragraphs 205 through 241 of this First Amended Complaint.

292.    Upon written request and pursuant to Minn. Stat. § 181.933, Defendant Tareen Dermatology, P.A. was obligated to provide Relator/Plaintiff Polzin with the truthful reason for her termination within ten working days following receipt of the request.

293.    Tareen Dermatology, P.A. violated Minn. Stat. § 181.933 by failing to provide Relator/Plaintiff Polzin the truthful reason for her termination in violation of Minn. Stat. § 181.933.

294.    Accordingly, pursuant to Minn. Stat. § 181.935 Tareen Dermatology, P.A. is liable for a civil penalty of $750.00.

### PRAYER FOR RELIEF

**WHEREFORE,** Relators the United States of America, and the State of Minnesota request that this Court:

A.    Enter judgment for the United States Government and Relators and against Defendants;

B.      Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.* and Minn. Stat. § 15C.02(a)(1);

C.      Award the United States Government and the State of Minnesota on whose behalf this Complaint has been brought damages against Defendants as required by law for Defendants' violations of the False Claims Act and its respective counterparts under state law as alleged in this Complaint;

D.      Assess civil penalties against Defendants as required by law for the false statements and false claims described in this Complaint;

E.      Award Relators an appropriate relator's share, in an amount to be agreed upon by the government and Relators or, if no agreement can be reached, by the Court, pursuant to 31 U.S.C. § 3730(d) and the equivalent statutory provisions in Minn. Stat. § 15C.02(a)(1);

F.      Award prejudgment interest;

G.      Award Relators statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d) and its state law counterparts;

H.      Award Relator/Plaintiff Polzin, with respect to her federal and state retaliation claims and claim of wrongful discharge in violation of public policy:

(1) Two times the amount of back pay that she would have had but for the retaliation, and interest on the back pay;

71

**Filed Under Seal Pursuant**
**To 31 U.S.C. §3730(b)(2)**

(2) Compensation for all damages, including emotional distress, sustained as result of the retaliation and discharge, in an amount to be determined at trial;

(3) Front pay in an amount to be determined at trial;

(4) Punitive damages;

(5) Litigation costs and reasonable attorneys' fees.

I.      Assess civil penalties against Defendants and for Relator/Plaintiff Polzin as required by Minn. Stat. § 181.935(b) of $25 per day not to exceed $750 for their failure to provide her the truthful reason for her termination; and

J.      Grant such other relief as the Court may deem just, necessary, and proper.

**Filed Under Seal Pursuant
To 31 U.S.C. §3730(b)(2)**

**RELATORS DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY**

**IS AVAILABLE.**

Respectfully submitted,

Dated:  March 11, 2022

Nathaniel F. Smith, MN No. 397276
Susan M. Coler, MN No. 217621
Gerald C. Robinson, MN No. 212787
Lon R. Leavitt, UT No. 11245
HALUNEN LAW
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone:  (612) 605-4098
Facsimile:  (612) 605-4099
coler@halunenlaw.com
smith@halunenlaw.com
robinson@halunenlaw.com
leavitt@halunenlaw.com

*ATTORNEYS FOR RELATORS*